FILED
2026 Sep-01 PM 02:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| DONALD DISMUKES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION CASE NUMBER: |
| v. | ) | |
| | ) | |
| BLUE ORIGIN MANUFACTURING, LLC, | ) | |
| | ) | |
| | ) | PLAINTIFF DEMANDS A TRIAL |
| Defendant. | ) | BY STRUCK JURY |

# COMPLAINT

## JURISDICTION AND VENUE

1. This is an employment discrimination action in which the Plaintiff, Donald Dismukes, alleges that the Defendant, Blue Origin Manufacturing, LLC, violated Title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. § 1981 by engaging in unlawful race discrimination and retaliation culminating in his employment with Blue Origin ending.

2. The jurisdiction of this court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343, 28 U.S.C. §§ 2201 and 2202.

3. Venue is proper because the Defendant employed the Plaintiff in Madison County, Alabama which is part of the Northeastern Division of the Northern District of Alabama.

## PARTIES

4. The Plaintiff, Donald Dismukes, is an adult resident of the State of Alabama.

5. The Defendant, Blue Origin Manufacturing, LLC ("Blue Origin"), is a domestic limited liability company formed in Madison County, Alabama.

6. In 2024, Blue Origin employed fifteen or more employees for twenty calendar weeks of the year.

7. Blue Origin is an employer for purposes of Title VII.

8. Blue Origin is an employer for purposes of 42 U.S.C. § 1981

9. Blue Origin is a subsidiary and operational entity of the private American aerospace manufacturer and suborbital spaceflight services company founded by Jeff Bezos.

## ADMINISTRATIVE REMEDIES

10. On February 7, 2025, Dismukes filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"). (Exhibit 1).

11. On June 3, 2026, the EEOC issued a Determination and Notice of Rights.

(Exhibit 2).

12. Dismukes filed this action within 90 days of the EEOC issuing him the Dismissal and Notice of Rights.

13. Dismukes timely initiated this action.

14. Dismukes fulfilled all conditions precedent to the institution of this lawsuit.

## FACTUAL BACKGROUND

15. Blue Origin hired Dismukes on March 28, 2022.

16. Blue Origin hired Dismukes as a Material Handler/Driver II at Blue Origin's Huntsville Engine Factory in Huntsville, AL.

17. Blue Origin later made Dismukes a lead for the A shift.

18. During the first year of Dismukes' employment, Blue Origin recognized his high performance and potential.

19. Dismukes' received a "High Contribution" rating on his 2022 annual performance review.

20. Dismukes' received an "On Track" rating on his 2023 mid-year performance review.

21. Dismukes' received a "High Contribution" rating on his 2023 annual performance review.

22. In Dismukes 2023 annual performance review, Blue Origin recognized

Dismukes as "a team player," who was "looking out for the HMT team," "looking at ways to improve our processes," "always one of the first to volunteer for holiday work," went “above and beyond the expectation of the other team members," and "earns the trust of others."

23. In the 2023 annual performance review, Dismukes manager noted that he "has forgone his holidays or time off to make sure that there is support at the factory" and that "the right decisions are made and the items correctly prioritized."

24. Dismukes developed the Hardware Movement Tag ("HMT") system to improve the efficiency of transporting parts throughout the factory.

25. Dismukes attended multiple meetings with production control management to help improve processes.

26. Dismukes worked on multiple holidays to support the team and mission.

27. Dismukes trained multiple employees, including employees in other states such as Florida.

28. Blue Origin entrusted Dismukes with training others on forklift operation and pit equipment.

29. Blue Origin assigned Dismukes to transport multimillion-dollar rocket engines.

30. Dismukes frequently worked overtime, weekends, and holidays.

31. Due to his extensive work scheduled, sometimes Dismukes received only one day off per week.

32. During his employment, Blue Origin moved Dismukes between eight (8) different shifts, including A shift, B shift, C shift, and weekend shifts.

33. Dismukes attended leadership meetings every day.

***Protected Activity and Complaints of Discrimination***

34. In October 2022, Dismukes reported to Human Resources that his former supervisor had assisted another employee with receiving an employee referral bonus for a candidate that the employee did not know.

35. Dismukes report was not a complaint that could give rise to a legal cause of action on his behalf.

36. Dismukes alleged that his former supervisor was friends with the candidate and asked the employee if he was interested in the referral money.

37. Blue Origin told Dismukes that it investigated his October 2022 complaint.

38. Blue Origin told Dismukes that the investigation substantiated Dismukes' allegation.

39. Blue Origin found Dismukes to be credible with respect to his allegation about his former supervisor.

40. Blue Origin terminated both Dismukes' former supervisor and the employee involved in the referral bonus misconduct.

41. Dismukes did not suffer any immediate adverse employment action because of making the October 2022 complaint.

42. Dismukes' October 2022 complaint did not deal with race discrimination or illegal retaliation.

43. In or around March 2024, Dismukes requested a promotion to a supervisor position.

44. Dave Brooks, Dismukes' manager, had previously told Dismukes that Blue Origin would promote Dismukes to supervisor.

45. Brooks promised Dismukes on multiple occasions that Dismukes would receive a supervisor promotion.

46. Dismukes was qualified to hold a supervisor position.

47. Dismukes wanted to become a supervisor and made this desire known to Brooks.

48. In early 2024, a supervisor position became available on the C shift.

49. Dismukes had reservations about the C shift supervisor position because it was for a shift which Dismukes had worked previously and knew lacked structure.

50. Dismukes discussed his reservations with Brooks.

51. Dismukes expressed he wanted to move into a supervisor position.

52. Dismukes expressed to Brooks that his preference would be to supervise A shift, the shift on which he was currently working.

53. Despite Dismukes' greater experience, qualifications, and performance, the supervisor position was given to Zach Sparkman, a less experienced white male employee who Dismukes had trained.

54. Sparkman did not have to perform the same extensive training, travel, overtime, or shift rotation duties that Dismukes performed.

55. Immediately after Blue Origin promoted Sparkman to C shift supervisor, Blue Origin then moved Sparkman to the A shift where Dismukes worked.

56. Brooks had not told Dismukes that supervisor position could led to supervising the A shift.

57. Dismukes expressed concerns in the workplace over Sparkman becoming his supervisor since he had been promoted over Dismukes and another experienced African American employee.

58. Dismukes sent an email to Brooks questioning why Sparkman, who was hired as C shift supervisor, was now supervising A shift.

59. Dismukes stated in his email that if he had known Sparkman would be

placed on the A shift, he would have applied for the supervisor position.

60. Dismukes opposed Sparkman's promotion as unlawful race discrimination.

61. After Blue Origin moved Sparkman to A shift and Dismukes expressed concerns over the promotion, Brooks and Sparkman began micromanaging Dismukes.

62. After Dismukes began voicing concerns about race discrimination in promotions, in a June 2024 leadership meeting, Brooks stated in front of the team that someone was "going to tell our dirty laundry."

63. Brooks also stated in the leadership meeting, in reference to placing Sparkman on Dismukes' shift, "people don't like Zach, and maybe people will quit."

64. Dismukes objected to Brooks's plan to intentionally create a hostile work environment to force employees to quit.

65. Dismukes voiced concerns during leadership meetings about the discriminatory treatment of his African American team members who were not being promoted despite their hard work and performance.

66. When Dismukes' team received additional contractor support, Brooks assigned the contractors to other shifts instead of Dismukes' shift, which was understaffed.

67. When Dismukes requested additional help for his shift, Brooks told Dismukes to "suck it up buttercup" in front of Dismukes' team.

68. A white female contractor named Hope cursed at Dismukes in public.

69. Dismukes responded to Hope professionally, telling her that he respected her and expected her to respect him.

70. Hope began crying and later apologized to Dismukes.

71. Dismukes reported the incident with Hope to his manager Dave Brooks and to senior manager Chris Morrow.

72. Approximately two days after Dismukes reported the Hope incident, Dismukes received a call from Human Resources stating that Hope had filed a complaint alleging that Dismukes had cursed at her.

73. Based on the timing, Dismukes believed Brooks may have encouraged Hope to file the complaint.

74. Dismukes told the Human Resources representative that Hope's complaint was false and constituted retaliation by management for Dismukes 's complaints about unfair and discriminatory treatment.

75. The Human Resources representative told Dismukes that based on his reviews and performance, the allegation against him did not sound accurate.

76. The Human Resources representative apologized to Dismukes and stated

that she appreciated the hard work that Dismukes did.

77. Dismukes requested to file a formal Human Resources complaint against Hope for making false accusations.

78. The Human Resources representative told Dismukes that she would "take care of it."

79. Blue Origin never took any action on Dismukes' request to file a complaint against Hope.

80. Hope did not face any disciplinary consequences for cursing at Dismukes or for filing a false complaint against him.

81. Multiple witnesses, including Michael Thompson and Donta McNeer, observed the Hope incident and can confirm that Dismukes handled the situation professionally and did not curse at Hope.

82. Dismukes also contacted Blue Origin's tip line to report the unfair treatment and discrimination he was experiencing.

83. Blue Origin ignored Dismukes' complaints to its tip line.

***Isolation, Increased Workload, and Unsafe Working Conditions***

84. After Dismukes began opposing unfair treatment and discrimination, Brooks began treating Dismukes differently.

85. Brooks assigned and/or caused to be assigned to Dismukes extra tasks

beyond those assigned to other team leads.

86. Brooks removed and/or caused Dismukes to be removed from his A shift team lead position and placed to work alone in a warehouse facility.

87. The warehouse facility to which Dismukes was assigned to work alone was designed to be staffed by six (6) people, but Dismukes was required to perform all tasks by himself.

88. Dismukes was responsible for facilitating operations for a facility serving over 300 people with insufficient staffing.

89. Dismukes called Brooks multiple times requesting help, but Brooks did not answer the phone.

90. Other employees were scared to help Dismukes because they feared they would get in trouble with management.

91. Dismukes was required to operate forklifts and move heavy materials alone without a spotter, in violation of safety protocols.

92. Blue Origin's forklift safety protocols required a spotter to be present when operating forklifts to move heavy materials.

93. Dismukes was forced to find someone to spot him or to operate the forklift alone in unsafe conditions.

94. As a result of the heavy workload and unsafe working conditions, Dismukes

sustained a back injury.

95. The on-site nurse at Blue Origin placed Dismukes on light duty due to his back injury.

96. Despite the nurse's light duty restriction, Brooks sent Dismukes back to work at full capacity.

97. Blue Origin did not provide Dismukes with medical assistance for his back injury.

98. Instead of helping, Blue Origin continued to isolate Dismukes in a physically demanding role.

***Pretextual Performance Review and False Accusations***

99. In or around August 2024, Dismukes received his mid-year performance review.

100. Dismukes' mid-year 2024 review was the first time he received a "Not on Track" rating.

101. Prior to the mid-year 2024 review, Dismukes had never received any written disciplinary action or coaching for performance issues.

102. In the mid-year 2024 review, Brooks accused Dismukes of multiple performance issues for the first time, including tardiness, timecard fraud, safety violations, and failure to perform required duties.

103. Brooks claimed that Dismukes was late on February 25, March 2, and March 8, 2024.

104. Brooks sent Dismukes an email on March 8, 2024, referencing these alleged instances of tardiness.

105. At no time prior to the mid-year 2024 review did Brooks issue Dismukes any written warning or disciplinary action for tardiness.

106. Other employees were late significantly more times than Dismukes but received less severe discipline.

107. Dismukes knew of an employee who was late more than forty times and only received one written warning.

108. Brooks accused Dismukes of submitting timecards indicating he worked hours on days he called-in sick, characterizing this as "timecard fraud."

109. Dismukes made unintentional errors on his timecard on isolated occasions due to his heavy workload and exhaustion.

110. It was common practice at Blue Origin for employees to make timecard errors and to be allowed to correct them without disciplinary action.

111. In or around May 2025, after Dismukes' termination, a white female employee named Ebony made an error on her timesheet by failing to record hours she had worked.

112. Sparkman simply instructed Ebony to correct her timesheet so he could approve her pay, with no disciplinary action taken.

113. Ebony confirmed that timesheet corrections were normal practice for other employees and that she was simply allowed to fix her error.

114. When Dismukes made a similar timecard mistake, he was not allowed to correct it, and it was instead used as justification for his termination.

115. Brooks accused Dismukes of exhibiting unsafe practices, such as using a forklift to pick up equipment that had fallen over without reporting the incident.

116. Blue Origin claimed that this incident was discovered only because it was caught on camera.

117. At no time did Brooks or any other manager, coach Dismukes, issue a written warning, or take any disciplinary action regarding any alleged forklift safety incident at the time it purportedly occurred.

118. If Dismukes had committed a safety violation involving a forklift, Blue Origin's standard practice would have been to conduct an immediate investigation, document the incident, and issue coaching or disciplinary action.

119. Despite the alleged safety violation, Dismukes continued to be assigned to

train other employees on forklift operation, which would not have occurred if Blue Origin genuinely believed Dismukes was a safety risk.

120. Brooks accused Dismukes of failing to perform required duties, specifically failing to move materials when asked to do so by a supervisor.

121. Dismukes consistently performed all assigned duties and frequently took on additional responsibilities beyond his job description.

122. During the mid-year review meeting on or about August 15, 2024, Brooks presented these accusations to Dismukes for the first time.

123. Dismukes was shocked and upset by the accusations because he had never been informed of any performance issues prior to the review.

124. Dismukes questioned the accuracy of the accusations during the review meeting.

125. Dismukes expressed his view that the negative review was unfair and constituted unlawful retaliation for his prior complaints about discrimination and unfair treatment.

126. Dismukes' frustration during the review meeting was a normal reaction to being blindsided with false accusations after years of excellent performance and dedication.

127. Brooks characterized Dismukes' reaction as Dismukes being "aggressive"

and "yelling."

128. Dismukes expressed he was upset, but he was not aggressive and did not yell.

129. Dismukes viewed Brooks' characterization as untrue and/or invoking a racial stereotype of an angry black man.

130. Brooks claimed that Dismukes told him, "I'll do anything I can to get you fired" and that employees outside the room heard the commotion.

131. Brooks' claim was false.

132. Dismukes did not say to Brooks "I'll do anything I can to get you fired."

133. Brooks and management were building a false record to terminate Dismukes.

134. Following the August 15, 2024, review meeting, Brooks consulted with Human Resources about terminating Dismukes' employment.

***Termination***

135. On or about August 21, 2024, Brooks sent Dismukes a message instructing Dismukes to report to the main facility at 6:00 a.m.

136. Prior to Dismukes arriving at the facility, Brooks requested that security personnel be present for Dismukes' termination.

137. Brooks' request for security to be present during the termination was unusual

because no other manager had ever made such a request when terminating an employee.

138. When Dismukes arrived at the facility on August 21, 2024, he encountered a security guard who was visibly emotional.

139. The security guard told Dismukes, with tears in his eyes, that management was going to terminate Dismukes.

140. The security guard told Dismukes that Brooks had requested security be present and had portrayed Dismukes as a threat.

141. The security guard told Dismukes, "You need to sue them" and "No manager ever did that."

142. The security guard informed Dismukes that Blue Origin planned to call police reinforcement.

143. Dismukes was afraid and felt that he was being treated as a dangerous person simply for being a Black man who had voiced concerns about discrimination.

144. Because he had been told he was being terminated, Dismukes turned in his laptop and badge to Brooks.

145. Within minutes of Dismukes turning in his laptop and badge, Dismukes received an email from Blue Origin notifying him of his termination.

146. The email Dismukes received confirmed that he had been terminated.

147. Blue Origin's position statement to the EEOC claimed that Dismukes "resigned his employment" rather than being terminated.

148. Blue Origin's characterization to the EEOC of Dismukes' separation as a resignation is false.

149. The fact that Brooks requested security to be present and characterized Dismukes as a threat demonstrates that Blue Origin intended to terminate Dismukes.

150. Blue Origin provided no legitimate reason for Dismukes' termination at the time it occurred.

***Comparator Evidence and Discriminatory Treatment***

151. Blue Origin treated 2hite employees more favorably than Dismukes and other African Americans despite the white employees having less experience and qualifications.

152. Blue Origin made Sparkman the A shift supervisor over Plaintiff and other more experienced African American employees despite Sparkman's inferior qualifications and experience.

153. Hope, a white female contractor, cursed at Dismukes publicly but faced no consequences, while Dismukes was later targeted for termination after

reporting the incident and other instances of unfair treatment.

154. White employees were promoted, protected, and excused for misconduct, while Dismukes was overworked, denied opportunities, retaliated against, and terminated.

155. David Lee, another African American employee with a master's degree, was also overlooked for promotion in favor of less qualified white employees.

156. Dismukes was the only African American team lead and was subjected to harsher discipline and greater scrutiny than white employees in similar positions.

157. Dismukes attended leadership meetings every day while white team leads only worked their regular schedules.

158. After Dismukes' termination, a white female employee named Jessica was promoted in less than a year because she had received high contributor ratings on her reviews.

159. Dismukes had received high contributor ratings every year he was employed until Blue Origin retaliated against him, yet Dismukes was never promoted.

160. Donta McNeer, an African American male who has been with Blue Origin for more than three years, has never been promoted and believes it is retaliation for speaking up.

161. Chris Roberts, an African American male employee, was also subjected to unfair treatment and was eventually terminated.

162. Chris Roberts witnessed the discrimination and retaliation that Dismukes faced.

***Damages***

163. As a direct and proximate result of Blue Origin's unlawful discrimination and retaliation, Plaintiff has suffered and continues to suffer significant harm.

164. At the time of his termination, Dismukes's hourly rate of pay was approximately $37 an hour.

165. Dismukes regularly worked 120 to 130 hours bi-weekly with mandatory overtime.

166. Dismukes has suffered lost wages, benefits, and other compensation from the date of his termination through the present.

167. Dismukes has been unable to secure comparable employment despite diligent efforts to find work.

168. Dismukes has experienced emotional distress, humiliation, anxiety, depression, and damage to his reputation because of Blue Origin's unlawful conduct.

169. Dismukes' career in the aerospace industry has been severely damaged because of his termination.

170. Dismukes aspired to retire from Blue Origin and viewed his position there as a long-term career.

171. Blue Origin's unlawful actions have deprived Plaintiff of that career opportunity.

**COUNT I**
**RACE DISCRIMINATION**
**TITLE VII**

172. For purposes of context, Dismukes adopts and incorporates the facts set forth above.

173. Prior to Dismukes' separation, he experienced disparate treatment based on race with respect to job opportunities, workload, discipline, working conditions, and terms and conditions of employment.

174. Blue Origin decided to terminate Dismukes' employment.

175. Blue Origin did not offer Dismukes any reason for his termination.

176. Learning of the decision to terminate his employment and fearing that Blue Origin was setting him up to be arrested, Dismukes turned in his laptop and keys to his supervisor to avoid any incident.

177. Because Blue Origin decided to terminate Dismukes's employment, his

employment with the company ended.

178. Dismukes' race was a motivating factor in the separation and termination of his employment with Blue Origin.

179. Blue Origin's conduct injured Dismukes.

WHEREFORE, PREMISES CONSIDERED, Dismukes requests this Court enter a judgment against Blue Origin Manufacturing, LLC under Title VII of the Civil Rights Act of 1964, as amended, pursuant to an Order by which this Court:

a. Awards compensatory damages to be determined by the trier of fact;
b. Awards punitive damages to be determined by the trier of fact;
c. Awards nominal damages to be determined by the trier of fact;
d. Awards injunctive and equitable relief including, but not limited to, training, backpay, reinstatement and/or reasonable front pay, and modification of Dismukes's personnel file(s);
e. Awards that relief which is fair, reasonable, and just;
f. Awards costs against Blue Origin Manufacturing, LLC including a reasonable attorney's fee.

**COUNT II**
**RETALIATION**
**TITLE VII**

180. For purposes of context, Dismukes adopts and incorporates the facts set

forth above.

181. Section 704(a) of Title VII of the Civil Rights Act prevents retaliation by employers. The relevant statutory language reads:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

182. Dismukes believed in good faith that Blue Origin discriminated against him and other African Americans with respect to job opportunities, discipline, working conditions, and other terms and conditions of employment.

183. Dismukes opposed what he believed in good faith to be unlawful race discrimination when he complained to Brooks about Sparkman becoming his supervisor.

184. Dismukes opposed what he believed in good faith to be unlawful race discrimination when he voiced concerns in leadership meetings about the way he and his team members were being treated as it related to promotions.

185. Dismukes opposed what he believed in good faith to be unlawful race discrimination when he attempted to file a complaint against Hope.

186. Dismukes opposed what he believed in good faith to be unlawful race

discrimination when he complained to Blue Origin's tip line.

187. Dismukes opposed what he believed in good faith to be unlawful retaliation discrimination when he complained to Human Resources.

188. After Dismukes began opposing what he believed in good faith to be unlawful race discrimination and retaliation, Brooks began subjecting him to heightened scrutiny, looking for ways to force Dismukes to quit, looking for ways to build a case to terminate Dismukes, and treated Dismukes differently than other employees as it related to job assignments, providing assistance, showing respect in the workplace, and discipline.

189. After Dismukes began opposing what he believed in good faith to be unlawful race discrimination and retaliation, Brooks worked with Blue Origin to terminate Dismukes' employment.

190. Dismukes engaged in activity protected by Title VII when he opposed what he believed in good faith to be unlawful race discrimination and retaliation.

191. Following Dismukes' protected activity, Blue Origin subjected him to a series of actions intended to discourage or dissuade him and others from engaging in protected activity, including, but not limited to:

a. Denying Dismukes a promotion while promoting less qualified white employees;

b. Isolating him by removing him from his team lead position and requiring him to work alone in unsafe conditions;

c. Increasing his workload beyond that assigned to other employees;

d. Refusing to provide him with adequate staffing or resources;

e. Ignoring his requests for assistance;

f. Allowing a white employee to make false accusations against him without consequence;

g. Issuing him his first negative performance review after years of excellent performance;

h. Falsely accusing him of performance and conduct issues for which he had never been disciplined;

i. Characterizing his normal reaction to false accusations as aggressive and threatening behavior;

j. Requesting that security be present during his termination and portraying him as a threat; and

k. Terminating Plaintiff's employment.

192. Blue Origin retaliated against Dismukes when it subjected him to heightened scrutiny, began making a file or case to terminate him, began looking for reasons to fire him, created and/or perpetuated conditions intended to

encourage him to quit, subjected him to different treatment, and caused his employment with Blue Origin to end.

193. Blue Origin's actions were intended to punish Dismukes for engaging in protected activity as well as to discourage and dissuade further protected activity.

194. Blue Origin's actions injured Dismukes.

WHEREFORE, PREMISES CONSIDERED, Dismukes requests this Court enter a judgment against Blue Origin Manufacturing, LLC under Title VII of the Civil Rights Act of 1964, as amended, pursuant to an Order by which this Court:

a. Awards compensatory damages to be determined by the trier of fact;
b. Awards punitive damages to be determined by the trier of fact;
c. Awards nominal damages to be determined by the trier of fact;
d. Awards injunctive and equitable relief including, but not limited to, training, backpay, reinstatement and/or reasonable front pay, and modification of Dismukes's personnel file(s);
e. Awards that relief which is fair, reasonable, and just;
f. Awards costs against Blue Origin Manufacturing, LLC including a reasonable attorney's fee.

**COUNT III**
**RACE DISCRIMINATION**
**42 U.S.C. § 1981**

195. For purposes of context, Dismukes adopts and incorporates the facts set forth above.

196. Dismukes' race is African American.

197. Prior to Dismukes' separation, he experienced disparate treatment based on race with respect to job opportunities, workload, discipline, working conditions, and terms and conditions of employment.

198. Blue Origin decided to terminate Dismukes' employment.

199. Blue Origin did not offer Dismuke any reason for his termination.

200. Learning of the decision to terminate his employment and fearing that Blue Origin was setting him up to be arrested, Dismukes turned in his laptop and keys to his supervisor to avoid any incident.

201. Blue Origin decided to terminate Dismukes's employment because of his race.

202. Blue Origin's conduct injured Dismukes.

WHEREFORE, PREMISES CONSIDERED, Dismukes requests this Court enter a judgment against Blue Origin Manufacturing, LLC under 42 U.S.C. § 1981, pursuant to an Order by which this Court:

a. Awards compensatory damages to be determined by the trier of fact;

b. Awards punitive damages to be determined by the trier of fact;

c. Awards nominal damages to be determined by the trier of fact;

d. Awards injunctive and equitable relief including, but not limited to, training, backpay, reinstatement and/or reasonable front pay, and modification of Dismukes's personnel file(s);

e. Awards that relief which is fair, reasonable, and just;

f. Awards costs against Blue Origin Manufacturing, LLC including a reasonable attorney's fee.

**COUNT IV**
**RETALIATION**
**42 U.S.C. § 1981**

203. For purposes of context, Dismukes adopts and incorporates the facts set forth above.

204. Dismukes believed in good faith that Blue Origin discriminated against him and other African Americans with respect to job opportunities, discipline, working conditions, and other terms and conditions of employment.

205. Dismukes opposed what he believed in good faith to be unlawful race discrimination when he complained to Brooks about Sparkman becoming his supervisor.

206. Dismukes opposed what he believed in good faith to be unlawful race discrimination when he voiced concerns in leadership meetings about the way he and his team members were being treated as it related to promotions.

207. Dismukes opposed what he believed in good faith to be unlawful race discrimination when he attempted to file a complaint against Hope.

208. Dismukes opposed what he believed in good faith to be unlawful race discrimination when he complained to Blue Origin's tip line.

209. Dismukes opposed what he believed in good faith to be unlawful retaliation when he complained to Human Resources.

210. After Dismukes began opposing what he believed in good faith to be unlawful race discrimination and retaliation, Brooks began subjecting him to heightened scrutiny, looking for ways to force Dismukes to quit, looking for ways to build a case to terminate Dismukes, and treated Dismukes differently than other employees as it related to job assignments, providing assistance, showing respect in the workplace, and discipline.

211. After Dismukes began opposing what he believed in good faith to be unlawful race discrimination and retaliation, Brooks worked with Blue Origin to terminate Dismukes' employment.

212. Dismukes engaged in activity protected by 42 U.S.C. § 1981 when he

opposed what he believed in good faith to be unlawful race discrimination and retaliation.

213. Following Dismukes' protected activity, Blue Origin subjected him to a series of actions intended to discourage or dissuade him and others from engaging in protected activity, including, but not limited to:

a. Isolating him by removing him from his team lead position and requiring him to work alone in unsafe conditions;

b. Increasing his workload beyond that assigned to other employees;

c. Refusing to provide him with adequate staffing or resources;

d. Ignoring his requests for assistance;

e. Allowing a white contractor to make false accusations against him without consequence;

f. Issuing him his first negative performance review after years of excellent performance;

g. Falsely accusing him of performance and conduct issues for which he had never been disciplined;

h. Characterizing his normal reaction to false accusations as aggressive and threatening behavior;

i. Requesting that security be present during his termination and

portraying him as a threat; and

j. Terminating his employment.

214. Blue Origin retaliated against Dismukes when it subjected him to heightened scrutiny, began making a file or case to terminate him, began looking for reasons to fire him, created and/or perpetuated conditions intended to encourage him to quit, subjected him to different treatment, and caused his employment with Blue Origin to end.

215. Blue Origin's actions were intended to punish Dismukes for engaging in protected activity as well as to discourage and dissuade further protected activity.

216. Blue Origin's actions injured Dismukes.

WHEREFORE, PREMISES CONSIDERED, Dismukes requests this Court enter a judgment against Blue Origin Manufacturing, LLC under 42 U.S.C. § 1981, pursuant to an Order by which this Court:

g. Awards compensatory damages to be determined by the trier of fact;

h. Awards punitive damages to be determined by the trier of fact;

i. Awards nominal damages to be determined by the trier of fact;

j. Awards injunctive and equitable relief including, but not limited to, training, backpay, reinstatement and/or reasonable front pay, and

modification of Dismukes's personnel file(s);

k. Awards that relief which is fair, reasonable, and just;

l. Awards costs against Blue Origin Manufacturing, LLC including a reasonable attorney's fee.

**PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY.**

Respectfully submitted,

/s/ Heather Newsom Leonard
Heather Newsom Leonard
ATTORNEY FOR PLAINTIFF

OF COUNSEL:

HEATHER LEONARD, PC
2105 Devereux Circle, Suite 111
Birmingham, AL 35243
(205) 977-5421
Heather@HeatherLeonardPC.com

**SERVE THE DEFENDANT VIA PROCESS SERVER:**

Blue Origin Manufacturing, LLC
c/o C T Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104